SAMUEL BAYER and Others, Respondents, Appellants, *v.* NATHAN BAYER, Appellant, Respondent.

First Department, February 26, 1926.

Partnership — action to impress trust on shares of stock purchased by defendant from stockholders of corporation, two-thirds of whose shares were held by partnership — partnership was one at will — in June, 1919, partnership discontinued business following disagreement among partners — final agreement winding up partnership was not executed until October, 1919 — shares purchased were owned by persons not connected with partnership — evidence shows that plaintiffs consented that defendant buy said shares for himself — shares were purchased without plaintiffs' knowledge on condition that defendant would not disclose purchase and that sellers might have first right to repurchase — plaintiffs tried secretly to buy same shares — partnership was legally dissolved in June, 1919 — after dissolution defendant owed no duty to plaintiffs — purchase of shares thereafter secretly or openly was legal — shares were not partnership property and purchase was not within scope of partnership — original owners of shares are necessary parties.

Shares of stock purchased by the defendant, one member of a copartnership at will composed of the plaintiffs and the defendant, will not be impressed with a trust in favor of the plaintiffs, on the theory that the defendant violated his obligation as a partner in secretly purchasing the shares of the corporation, two-thirds of whose shares were then held by the partnership, since it appears that the shares purchased were originally owned by two men who were not in any way connected with the partnership; that in June, 1919, a disagreement arose among the partners and they then determined to and did discontinue the partnership business and did not thereafter do any partnership business except to wind up the affairs of the partnership; that in August, 1919, prior to the time defendant purchased the shares, the plaintiffs consented that the defendant might, if he wished, purchase said shares for his own benefit; that the defendant did thereafter, without the knowledge of the plaintiffs, purchase the shares under an agreement with the sellers that he would not disclose the fact of purchase and would give the sellers the first opportunity to repurchase the shares; that the plaintiffs also secretly endeavored to purchase said shares from the original holders, and that the agreement winding up the partnership affairs was not executed until October, 1919.

The partnership was legally dissolved in June, 1919, when the partners disagreed and determined to discontinue the partnership business, and from that date on the defendant was under no fiduciary duty to the plaintiffs to refrain from purchasing the stock in question, and furthermore, if the defendant did violate any fiduciary relationship, the plaintiffs were equally guilty of a violation of said relationship and cannot ask a court of equity to intercede.

Since the partnership was dissolved in June, 1919, the defendant had a legal right to purchase the shares in question and it is not material that he purchased said shares without the knowledge of the plaintiffs.

The defendant did not, by purchasing the shares in question, obligate himself on the theory that he was purchasing property in which the partnership had an interest, for the partnership did not have any interest in the shares so

purchased, and furthermore, the purchase by the defendant was not made within the scope of the partnership affairs.

The original owners of the shares in question are necessary parties to this action, since it appears that under the contract by which the defendant purchased the shares, it was stipulated and agreed that the original owners would have the first right to repurchase the shares if the defendant desired to sell; the original owners have certain rights in the shares in question which cannot be determined without their presence.

BURR, J., dissents.

CROSS-APPEALS from a judgment of the Supreme Court, entered in the office of the clerk of the county of New York on the 28th day of December, 1923, upon the decision of the court rendered after a trial at the New York Special Term directing that the defendant hold seventy-six shares of the capital stock of the Montville Finishing Company in trust for himself and the plaintiffs upon the terms and conditions provided by the said judgment.

The appeal of the defendant is from each and every part of the judgment, except the final paragraphs thereof staying its operation pending this appeal and giving to either party the permission to apply to the trial court for other or further relief at the foot of the decree.

The appeal of the plaintiffs is from so much of the said judgment as directed the plaintiffs to tender to the defendant the sum of $13,500, with interest from August 13, 1919, which sum the defendant paid for the said seventy-six shares of stock of the said Montville Finishing Company, and which the trial court imposed as a condition of obtaining the relief granted to plaintiffs. The plaintiffs also appeal from so much of said judgment as directed the defendant to transfer the certificates for said seventy-six shares of stock to himself, as trustee for the plaintiffs and himself as their personal representatives and assigns, and directs him to obtain from the Montville Finishing Company a new certificate issued to himself, as such trustee, and that he shall hold the said certificate of stock as such trustee until October 27, 1933, and in so far as said judgment fails to require the defendant to transfer fifty-four shares of the stock of the Montville Finishing Company to the plaintiffs upon the entry of judgment, or, in the alternative, to transfer seventy-six shares of said stock to some third person or trust company, as trustee.

*Louis Marshall* [*James Marshall* with him on the brief], for the plaintiffs.

*David L. Podell* [*John W. Davis* of counsel; *David L. Podell* and *Herman Shulman* with him on the brief], for the defendant.

MERRELL, J.   This controversy concerns the purchase made by the defendant on August 13, 1919, of seventy-six shares of stock

of the Montville Finishing Company, a corporation organized under the laws of the State of New Jersey, from the two holders of said purchased stock, William R. Booth and John J. Healion.

For several years prior to June 11, 1919, the plaintiffs and the defendant were copartners in business, under the firm name of Bayer Brothers, engaged in the purchase of cotton goods in an unfinished state or, as they were known, "in the grey." These goods were either resold in their raw state to the wholesale or jobbing trade or were converted and finished for the firm, and the converted and finished goods sold to the trade. The firm of Bayer Brothers consisted of the four plaintiffs, who collectively owned a seventy-one per cent interest in said partnership, and the defendant, who owned the balance, or a twenty-nine per cent interest therein. Of the partners, the plaintiff Samuel Bayer and the defendant Nathan Bayer were brothers. The plaintiffs Henry Bayer and Alexander Bayer were sons of the plaintiff Samuel Bayer, while the fourth plaintiff, Philip Bayer, was a brother of Samuel Bayer. The copartnership agreement was a verbal one, there never having been any written agreement between the participants evidencing the formation of the copartnership. Consequently no definite time was fixed for its continuance. In or about the month of September, 1913, the said copartnership acquired a two-thirds interest in the capital stock of the Montville Finishing Company, a New Jersey corporation. The capital stock of said company consisted of 240 shares of common stock of the par value of $100 per share. One hundred and sixty shares of said capital stock were thus acquired by the partnership of Bayer Brothers. The balance of the capital stock of the Montville Finishing Company, consisting of 80 shares, was owned by the two persons, William R. Booth and John J. Healion, who were actively connected with said finishing company from its organization. In the said 80 shares of stock owned by Booth and Healion, the copartnership of Bayer Brothers had no interest whatever. Owning two-thirds of the capital stock of the Montville Finishing Company, the plaintiffs, from the organization of said company, controlled its production. Bayer Brothers had some, but not all, of their goods finished at the mills of said corporation. The copartnership was naturally actively interested in the affairs of the finishing company and assisted said company financially. In June, 1919, the Montville Finishing Company was indebted to the copartnership of Bayer Brothers in about $205,000. In June, 1919, differences arose between the plaintiffs and the defendant "with respect to the business and affairs of said copartnership." On June 11, 1919, a meeting of the members of the copartnership was held at the

office of said copartnership and said differences were discussed, and at such conference Samuel Bayer, a plaintiff, announced that under no circumstances would these plaintiffs continue the partnership of Bayer Brothers as then constituted. At the said conference on June 11, 1919, the said differences became more acute, quarrels and disagreements occurred, and it was apparent to all in attendance that said partnership would not longer be continued. As a result of such conference, the copartnership ceased doing business as a going concern, and from that time on the entire efforts of the partners were devoted to the closing up of the copartnership affairs and in an attempt to agree upon a distribution of the assets among themselves. After said meeting the attorney who had theretofore served the copartnership, and who was the brother-in-law of the defendant, was ousted and other counsel employed in his place, while he continued to act as attorney for the defendant. The assets of the copartnership at this time amounted to over $1,000,000. Its affairs were complicated and extensive and several months were required in the process of winding up. The trial court found that from the time of the conference on June 11, 1919, until the final termination of the partnership and distribution of its assets, the partnership ceased to conduct its business as a going concern, and that at all times after June 11, 1919, until the final termination of said partnership, both the plaintiffs and defendant devoted their entire time and attention to the winding up of the affairs of the partnership, and that after the month of June, 1919, the defendant did not bind the copartnership or assume any obligations in its behalf, nor did he perform any duties as a member of such copartnership, except to render such assistance as was required by the plaintiffs or others in the process of winding up the copartnership business. Following the conference on June 11, 1919, and until the final termination of the copartnership the parties held frequent conferences relative to the distribution of the assets of the copartnership and the winding up of its affairs. At these conferences the disposition of the 160 shares of stock of the Montville Finishing Company owned by the copartnership was discussed and a voting arrangement was considered whereby the interests of the plaintiffs and of the defendant in said Montville Finishing Company stock held by the partnership might be adequately protected. The trial court found that in the month of August, and prior to the 13th of August, 1919, a conference took place at the office of Alexander A. Mayper, at which there were present the said Alexander A. Mayper, defendant's attorney, the defendant Nathan Bayer, and the plaintiffs Philip Bayer and Alexander Bayer, one Max Silverstein, the attorney for said plaintiffs, and also one Israel Unterberg. On the

occasion of said conference the defendant stated to Philip Bayer, in substance: " How do I know that you won't put me out of the Montville Finishing Company? " to which the said Philip Bayer replied: " You need not worry. We would not do anything like that to you." And to which the defendant replied: " I am not so sure you won't; I want to be sure about it and I want to be protected. Will you sign some paper to that effect? "

The trial court also found that prior to the 13th day of August, 1919, the defendant made efforts to secure from the plaintiffs a voting trust agreement whereby and wherein the defendant would be protected as a minority stockholder of the Montville Finishing Company and against the adverse control by the plaintiffs of the stock of said company upon division of the 160 shares of said stock owned by the copartnership and in which the defendant had an undivided interest as a copartner in said firm. The defendant and his attorney, Mayper, both testified, in effect, that at this conference at the office of defendant's attorney, the plaintiffs, through Philip Bayer, consented to the defendant's purchase of the Booth and Healion stock and that in effect the said Philip Bayer told the defendant that if he distrusted his copartners and was afraid that his interest as a minority stockholder would not be protected he was at liberty to go out and buy up the Booth and Healion stock. The plaintiffs Philip Bayer and Alexander Bayer and their attorney, Silverstein, denied that such consent to defendant's purchase of the Booth and Healion stock was given at such meeting. The testimony of said plaintiffs and their attorney, however, creates considerable doubt as to their veracity. Reference will hereafter be made to such testimony and the various inconsistencies thereof. The evidence showed that directly after the conference at the office of defendant's attorney, for the purpose of protecting the defendant's minority interest in the Montville Finishing Company, the defendant approached Booth and Healion with a view of purchasing a part or all of their stock holdings in said company. Booth and Healion were informed by the defendant that the copartnership of Bayer Brothers, formerly existing, was in process of winding up its affairs, and that he was afraid he would be " put out on the street," because upon the termination of the partnership affairs he would be so small a minority stockholder in the Montville Finishing Company. Booth and Healion were reluctant to dispose of their stock, but were willing to assist the defendant, if possible. They first offered to loan him some of their stock that he might vote the same and protect his minority interest in the finishing company. The defendant, however, insisted that the only way he could be protected would be by a purchase of their shares outright. Finally

Booth and Healion told the defendant that they would each sell him thirty-eight shares of their stock, but upon condition that the defendant would not disclose to the plaintiffs the fact of such purchase, and upon the further condition that the defendant would not sell, transfer, assign or set over such shares of stock so purchased to any one without first offering such shares so purchased to the said Booth and Healion for repurchase at the same price they received therefor. It was agreed between the said Booth, Healion and the defendant that they should receive for said stock $250 per share. The defendant purchased said shares on August 13, 1919, paying for the same from his private funds upon the terms and conditions aforesaid. It is such purchase of the said seventy-six shares of stock owned by Booth and Healion that the plaintiffs in the present action attack, and which the plaintiffs claim was in violation of defendant's fiduciary obligation to the plaintiffs. The plaintiffs seek an assignment to them of seventy-one per cent of said stock so purchased by the defendant. The fact that the defendant had actually acquired said stock was not disclosed for some time after he had acquired ownership thereof, and was not known to the plaintiffs at the time of the final termination of the copartnership and the distribution of its assets in October, 1919. The position of the plaintiffs upon the trial was that the defendant, at the time he purchased the seventy-six shares of stock from Booth and Healion, was a member of the firm of Bayer Brothers, and at that time occupied toward his copartners such a position of trust and confidence as precluded him from acquiring the said stock. The trial court has held that the defendant, in acquiring said stock, violated his fiduciary duty to his copartners; that at the time said stock was acquired the copartnership of Bayer Brothers had not been dissolved and that the defendant's relationship to his fellow-partners was such as precluded his obtaining to himself the said stock of the Montville Finishing Company. So far as Booth and Healion were concerned, the evidence leaves no room for doubt that they were the absolute owners of the stock which they sold to defendant; that neither of them had any interest in the copartnership of Bayer Brothers; and that the said copartnership, as such, had no interest in the stock held by Booth and Healion.

I am of the opinion that the learned trial court erred in awarding the judgment appealed from. I am of the opinion that not only are the plaintiffs not entitled upon the evidence to judgment in their favor, but that said judgment is based upon findings of fact made by the learned trial court contrary to and against the weight of the evidence, and that the weight of the evidence clearly estab-

lished that the purchase of the stock in question by the defendant was made with the consent of the plaintiffs; moreover, that the weight of the evidence at the trial established, and that the trial court should have found, that the plaintiffs themselves were guilty of the very acts of bad faith which they charge against the defendant, and that at the time the defendant was negotiating for the purchase of the Booth and Healion stock, or soon thereafter, the plaintiffs were actively engaged in an attempt themselves to purchase said stock and thereby to gain an advantage over the defendant. Furthermore, the evidence established, and the court found, that after the open break between the copartners at the meeting on June 11, 1919, the plaintiffs secretly and without defendant's knowledge entered into new contracts with salesmen to take effect after the final termination of said copartnership, whereby the plaintiffs, although the defendant was to have the right to continue in the same business, hired for the plaintiffs' use three of the leading salesmen theretofore employed by the copartnership, who were fully acquainted with the business of the firm and had become valuable therein, to continue in their employ after the termination of the partnership. I am of the opinion that such acts on the part of the plaintiffs constituted fully as great a breach of faith toward the defendant as that with which the defendant is charged in acquiring the Booth and Healion stock. It thereby appeared that the plaintiffs were secretly attempting to put themselves in the best possible position to continue their business after the copartnership was terminated, and that in pursuance of such policy they attempted to secure for themselves as many of the assets of the copartnership as possible. The court, however, while finding the fact of such secret efforts on the part of the plaintiffs, refused to find that such conduct on plaintiffs' part constituted either a defense or a counterclaim to their cause of action. The court held that the contracts were personal in their nature and were only to take effect at the dissolution, and that no bad faith could be predicated upon the efforts of the copartners to prepare for a continuance of the business. In this regard the learned trial justice at the trial, in his opinion, said: " It was understood from the date of the quarrel that these plaintiffs would continue to do business after dissolution, and I can find no bad faith in preparations made before hand to continue the business. The salesmen were informed of the impending dissolution, and they were free to make contracts of employment with any of the parties, and no contract so made could inure to the benefit of the other parties." (122 Misc. 7, 12.)

It is difficult to differentiate the reasoning of the learned trial

court concerning the hiring of the salesmen to aid the plaintiffs who were to continue the copartnership after the dissolution of the firm of Bayer Brothers, in which the defendant was interested, from the purchase by the defendant of stock in which the copartnership had not the slightest interest and which was no part of the copartnership property, and which the defendant was making for his own protection *after the dissolution of the copartnership.* Certainly any advantage which the defendant might obtain by the purchase of said stock would not in any way work to the disadvantage of the copartnership of Bayer Brothers during its existence. In both cases the parties making the respective contracts knew of the " impending dissolution " and were free to make contracts with any of the parties. Certainly Booth and Healion were as free to dispose of their shares of the stock of the Montville Finishing Company, and which they held separately and distinctly from the copartnership of Bayer Brothers, as the salesmen, who had been employed by the copartnership, were to contract for their services. If the learned court was right in holding that the secret hiring of these salesmen by the plaintiffs in an effort to insure the firm's success after the copartnership was ended was beyond criticism, then, by the same token, I think the court should have held that the acquiring of the Booth and Healion stock by the defendant, even though it were secret, for the purpose of protecting his interest in the Montville Finishing Company, was likewise rightful.

Not only are we of the opinion that, upon the evidence, the court should have found that the purchase of the seventy-six shares of the Montville Finishing Company by the defendant was made with the consent of the plaintiffs, and that the weight of the testimony clearly established, and the court should have found, that the plaintiffs themselves were guilty of attempting to consummate the very acts for which they assail the defendant; and that, under the facts as found by the trial court, the plaintiffs were guilty of such inequitable conduct as should deny them relief in a court of equity, but, for reasons hereinafter stated, we are of the opinion that the purchase of the stock in question by the defendant was made after the firm of Bayer Brothers had been effectively dissolved and at a time when the defendant owed no duty toward the plaintiffs which denied him the right to purchase the shares in question.

We are of the opinion, furthermore, that the purchase by the defendant of the seventy-six shares of stock in the Montville Finishing Company held by Booth and Healion was not the purchase of property in which the partnership of Bayer Brothers

had any interest, nor was it a purchase within the scope of the partnership business, and that, therefore, the defendant had a right to make such purchase for his own benefit.

We are of the opinion that by a fair preponderance of the evidence presented at the trial it appeared that the plaintiffs consented to the purchase of the Booth and Healion stock by the defendant. The defendant testified that at a meeting held at the office of his attorney, Mr. Alexander A. Mayper, prior to August 13, 1919, on which last-mentioned date the Booth and Healion shares were purchased by the defendant, a conference was held, at which the defendant, his attorney, Mayper, the plaintiffs Philip Bayer and Alexander Bayer, and their attorney, Max Silverstein, and also one Israel Unterberg, were present. The defendant and Mayper, his attorney, both testified that this conference occurred some time prior to August 13, 1919, the date on which the defendant purchased the shares in question. The plaintiffs Philip Bayer and Alexander Bayer admitted that a conference was held at the office of the defendant's attorney at which Mr. Unterberg was present, but testified that such conference was in the month of September, 1919, instead of early in August of that year. Their attempt to fix the date of such conference on a day subsequent to the acquisition of the Booth and Healion stock by the defendant was with the obvious purpose of supporting their version of what occurred at the conference and to destroy the legal effect of their consent to the purchase of the stock by the defendant. However, the learned court disbelieved the said plaintiffs and found in accordance with the testimony of the defendant and his attorney that the conference occurred prior to August 13, 1919. The trial court found that one of the principal matters discussed at this conference was the distribution of the stock of the Montville Finishing Company. The court found that the defendant at this conference made efforts to secure from the plaintiffs a voting trust agreement whereby and wherein the defendant would be protected as a minority stockholder of the Montville Finishing Company against an adverse majority control by the plaintiffs of the stock of said corporation upon the division of the 160 shares of said stock owned by the copartnership and in which the defendant had an undivided interest as a copartner of the firm of Bayer Brothers. The court found that the defendant contended that the plaintiffs might buy enough of the stock to enable them to destroy his rights and dispose of the property and production of the mill as they saw fit, and thus deprive the defendant of a fair share of the mill's production. The court also found that Philip Bayer said they would not do that and that the defendant asked him to sign an

agreement to that effect, which he refused to do. The trial court also found that at this meeting held at the office of the defendant's attorney the plaintiffs refused, upon request of the defendant, to enter into any voting trust agreement with the defendant whereby the 160 shares of stock of said finishing company owned by said copartnership would, after the termination of the copartnership, be voted for their mutual benefit. The trial court also found that at such conference the defendant stated to the plaintiff Philip Bayer in substance: " How do I know that you won't put me out of the Montville Finishing Company? " and that Philip Bayer stated: " You need not worry; we would not do anything like that to you." And that the defendant stated: " I am not so sure you won't; I want to be sure about it and I want to be protected. Will you sign some paper to that effect? " Both Mayper and the defendant testified that when the plaintiff Philip Bayer asked the defendant what he was worrying about, the defendant replied that he was afraid they would acquire some stock and throw him " out on the street," and that thereupon Philip Bayer in substance stated: " If you are worried, you can go and buy the stock, we don't care." Defendant testified: " I asked Mr. Philip Bayer that he should not buy two-thirds of the Montville Finishing Co. stock as I understood that $66\frac{2}{3}$ is a very dangerous thing in the corporation, and it would put me out altogether of this stock. And Philip Bayer says, ' You go ahead and buy two-thirds.' I said to him, ' There is not so many shares outstanding '— there was only about 53 per cent between all, and I say, ' If you buy control would you put the stock in a trust, that we should not have any fight about it.' He says, ' We would not put our stock in trust at all; if you want to buy control, go ahead and buy it if you can.' "

Both the plaintiffs Philip Bayer and Alexander Bayer denied that such conversation took place. They, however, admitted that they were present at a conference at the office of defendant's attorney during part of which Mr. Unterberg, a family friend, was present. As before stated, they attempted to fix the date of this conference as in September, 1919, instead of August. The court, however, disbelieved the testimony of the plaintiffs Philip Bayer and Alexander Bayer and found in accordance with the testimony of the defendant and his attorney Mayper, that the conference occurred prior to August 13, 1919, and prior to the time when defendant commenced his negotiations to acquire from Booth and Healion their shares of stock. I think the probabilities clearly accord with the testimony of the defendant and Mayper, his attorney, and support the finding of the trial court that this conference occurred prior to the defendant's efforts to obtain the

Booth and Healion stock. When the defendant was unable to obtain any written agreement from the plaintiffs that would protect him in his stock holding in the Montville Finishing Company, and when, as found by the trial court, the plaintiffs refused to enter into any trust agreement with reference to said stock, the natural thing for the defendant to do was to protect himself by the purchase of the Booth and Healion stock. It may well be that when Philip Bayer told the defendant that if he was worried he might go and buy sufficient of the outstanding stock of the finishing company to protect himself, he spoke on the impulse of the moment and in the belief that the defendant would be unable to purchase said stock, in view of the plaintiffs' unsuccessful efforts to purchase the same. In finding that the conference at the office of defendant's attorney occurred prior to the date when said stock was purchased, the court found that the plaintiffs were falsifying in their testimony that the conference occurred in September, and after the defendant had acquired the stock. The plaintiffs were most positive in their testimony that this conference occurred in September. Their testimony was with the obvious purpose of showing that any consent which the defendant claimed they had given to the purchase of the stock was at a time subsequent to its actual acquisition by the defendant. The court having found in accord with the testimony of the defendant and his attorney that the conference actually occurred prior to August thirteenth, and contrary to the attempt of the said plaintiffs to fix the date of the conference on a date subsequent to August thirteenth, we think under all the evidence and probabilities of the case it should also have found that at the conference the plaintiffs did, in fact, consent to defendant's purchasing the said shares of stock, as testified to by the defendant and his attorney. On this subject the learned trial justice seemed to be in considerable doubt, and in the course of his opinion said: " I have reluctantly come to the conclusion that the version of neither side can be accepted in whole, and I have determined that the probability is there was a discussion in regard to placing the copartnership stock in a voting trust, August thirteenth, when the defendant purchased the additional stock. The defendant's suggestion for such a voting trust was declined but I cannot believe that any of the plaintiffs told the defendant in words or effect that he was free to purchase the outstanding stock. It may perhaps be conjectured that there was some talk about the impossibility of buying that stock which the defendant now believes included a suggestion to buy it if he could but I cannot find that such a suggestion was actually made." (122 Misc. 12.)

Notwithstanding the indecision of the trial court, we are of the opinion that the weight of the evidence clearly shows that the plaintiffs did consent to the purchase of the stock by the defendant, and that the testimony of the defendant and his attorney in this respect is entitled to greater weight than the testimony of the plaintiffs Philip Bayer and Alexander Bayer and their attorney, Silverstein. Concerning what occurred at this conference, the testimony of the plaintiffs Alexander Bayer and Philip Bayer and that of their attorney, Silverstein, is not at all in accord. Alexander Bayer testified that there was some talk as to a voting arrangement whereby each one's interest in the Montville Finishing Company was to be protected and its production divided. Philip Bayer testified positively that no such talk was had or subject of discussion taken up. He, however, admitted that Alexander Bayer would always tell the truth. When the plaintiffs' attorney, Silverstein, was sworn he testified that the defendant said to the plaintiff Philip Bayer: " How do I know that you won't put me out of the Montville Finishing Company? " and Philip Bayer replied: " You need not worry; we would not do anything like that to you," and that Nathan Bayer then said, " I want to be sure about it and I want to be protected. Will you sign some paper to that effect? " Thus the testimony of Silverstein coincides substantially with that given both by the defendant and his attorney, Mayper. This testimony is denied *in toto* by the plaintiff Philip Bayer and in part is denied by the plaintiff Alexander Bayer. We are unable to see how the trial court, in view of such discrepancies and contradictions in the testimony of the participants on the side of the plaintiffs at said conference, could have believed the testimony of said plaintiffs and their attorney that no consent was given to the purchase of said stock by the defendant, as against the reasonable and probably truthful testimony of the defendant and his attorney. We think the finding of the trial court that no consent was given to the purchase of said stock by defendant was clearly against the weight of the evidence.

We are also of the opinion that the finding of the trial court that the plaintiffs were not at the time defendant was negotiating for the Booth and Healion stock or shortly thereafter, themselves attempting to purchase said shares for their own benefit was against the weight of the evidence. That the plaintiffs were attempting to acquire the Booth and Healion stock secretly for their own benefit was proven upon the trial by the testimony of two entirely disinterested witnesses, Booth and Healion. Having found that the plaintiffs had deliberately falsified concerning the conference at the

30

office of the defendant's attorney, and the court having disbelieved the testimony of the plaintiffs and believed that of the defendant and his attorney that said conference occurred prior to August 13, 1919, and the trial court also having found that the plaintiffs had entered into secret contracts of employment with their salesmen against the denial thereof by the plaintiff Alexander Bayer who had negotiated such contracts, we think the court was hardly justified in disregarding the sworn testimony of two *disinterested* witnesses as against the flat denial of the plaintiffs. The opinion of the learned justice presiding at the trial below indicates that the trial court believed the defendant to be an honest man. The trial court in the course of his opinion said of the defendant: " I am unwilling to hold that the defendant has been guilty of any intention of bad faith, for he *impressed me as an honest man.*" (Italics are the writer's.) A perusal of the testimony in the case seems to us to fully justify the favorable opinion of the defendant which the court thus professed to entertain. As against such favorable expression regarding the defendant, the court, upon two important issues where the veracity of the plaintiffs as against that of the defendant was at stake, believed the defendant and found that the plaintiffs were falsifying. Under such circumstances we are unable to understand how the court could accept the flat denial of the plaintiffs as against the testimony of two wholly *disinterested* witnesses. Booth and Healion, the holders of eighty shares of the stock of the Montville Finishing Company, had absolutely no connection with the firm of Bayer Brothers or any of its members. Undoubtedly they were friendly with all and desired to retain the good will of all the members of the firm. No possible motive suggests itself why they should have testified falsely against the plaintiffs. Indeed, it would seem that their interests should have prompted them to favor plaintiffs. The testimony given at the trial of one of these witnesses, Healion, is attacked as being contrary to testimony first given by him on an examination before trial, that the plaintiffs did not attempt to purchase from him his shares of stock, but which testimony he subsequently retracted and corrected. As showing the honesty of this witness and of Booth, the other disinterested witness, the circumstances under which Healion's testimony was given before trial and afterwards retracted are of considerable significance. Counsel for the plaintiffs desired the examination of Booth and Healion before trial and, upon consent of the defendant, such examination was had. The examination was held at Montville, New Jersey. Counsel for the defendant was not present in person, and the cross-examination of the two witnesses was adjourned to the office of counsel for the

plaintiffs in the city of New York, at which time counsel for the defendant undertook the cross-examination of the witnesses. During the course of the cross-examination of Healion he denied any attempt by the plaintiffs to purchase his stock in the Montville Finishing Company. After making such denials, Booth, who was present at the time, refused to submit to cross-examination, his plea being that he understood that the hearing was to be informal, and that the details could not be inquired into. He asked the privilege of consulting counsel before submitting to cross-examination. The hearing was thereupon discontinued to enable Booth to consult his counsel and appear upon an adjourned day. On the adjourned day Booth and Healion appeared. Booth was asked his reasons for refusing to be cross-examined at the last hearing, and he testified that after hearing Healion's testimony at cross-examination he knew such testimony was incorrect and untrue; that he found himself placed in the position of either testifying falsely to support the testimony given by his friend and partner, Healion, or contradicting it flatly; that after the previous hearing he had called the specific attention of Healion to his untruthful testimony and that on the same night both Booth and Healion had gone to their counsel who advised them to tell the truth and advised Healion to correct his false testimony previously given. Healion then went upon the witness stand and corrected his testimony and upon the cross-examination then had both Booth and Healion testified fully and fairly that within one, two or three weeks after August 13, 1919, the three plaintiffs Philip Bayer, Alexander Bayer and Henry Bayer had visited the home of Booth at night, and that Booth had called in Healion, and that all three plaintiffs had made an effort to secure the purchase of the Booth and Healion stock secretly for the benefit of the plaintiffs. The occurrence at the hearing on the examination before trial where Booth refused to submit to cross-examination demonstrates to our satisfaction that the only reason for such refusal was that given by Booth that he was faced with the dilemma of either testifying falsely in support of his erring friend and partner or of coming out flatly and contradicting such untruthful testimony. In the predicament in which Booth found himself he realized that he must have time to consider and after an adjournment was granted for the purpose of consulting his counsel, both Booth and his partner, Healion, did consult counsel and received the correct advice that Healion should retract his untruthful testimony and that the truth should be told. We are convinced that the testimony as finally given by these two witnesses was in accordance with what actually occurred, and that the three plaintiffs did, shortly after defendant

acquired the stock, make a nocturnal pilgrimage to the home of Booth and made an effort to obtain the Booth and Healion stock secretly and for their own benefit. Had Healion been friendly to the defendant to the extent of deliberately perjuring himself at the trial he would not have denied in the first instance that the three plaintiffs had been present at Booth's home. The denial which he thus made in his direct examination and in his first cross-examination would indicate that he was seeking to help the plaintiffs with his testimony. The three plaintiffs denied that they were present at the home of Booth and attempted to purchase the Booth and Healion stock. Why should the trial court have believed the truth of such denial on their part against the testimony of two witnesses certainly uninterested in favor of the defendant, when the court disbelieved the positive and unequivocal denial by the same plaintiffs of the testimony of three disinterested salesmen concerning their secret employment by plaintiffs? Throughout the trial the plaintiffs assumed the attitude of denying all the material facts involved in the controversy which appeared to them to be to their financial disadvantage, and in all other instances, save this attempt to purchase the stock of Booth and Healion, the court found that the plaintiffs were testifying falsely. The testimony of both Booth and Healion is positive and unequivocal that the three plaintiffs appeared under cover of darkness in the home of Booth and attempted to purchase their stock. The plaintiffs deny such pilgrimage. Either the plaintiffs or Booth and Healion were deliberately falsifying. Booth and Healion had no motive to perjure themselves, while it was to the financial interest of the plaintiffs, and, indeed, the very life of their case depended upon their denial of the testimony of Booth and Healion. We are, therefore, of the opinion that the learned trial court erred in disbelieving the testimony of Booth and Healion and in believing that of the plaintiffs and in finding that the plaintiffs did not attempt to secretly purchase for their own benefit from Booth and Healion their shares of the stock of the Montville Finishing Company prior to October, 1919, which marked the final termination and winding up of the copartnership. If the plaintiffs made such secret attempt to purchase said stock for their benefit prior to October, 1919, and if the copartnership was at the time in existence, such conduct on their part precludes their seeking relief in a court of equity. It is an ancient maxim that " He who comes into equity must come with clean hands." In Pomeroy's Equity Jurisprudence (4th ed. § 397) the rule is thus stated: " It [this maxim of equity] assumes that the suitor asking the aid of a Court of Equity has himself been guilty of conduct in violation of the fundamental

conceptions of equity jurisprudence, and, therefore, refuses him all recognition and relief with reference to the subject-matter or transaction in question. It says that whenever a party, who, as *actor*, seeks to set the judicial machinery in motion and obtain some remedy, has violated conscience, or good faith, or other equitable principle, in his prior conduct, then the doors of the Court will be shut against him *in limine;* the Court will refuse to interfere on his behalf, to acknowledge his right, or to award him any remedy." (See, also, *Dworsky* v. *Herstein*, 207 App. Div. 333; *Olcott* v. *Knapp & Co.*, 96 id. 281.) In the latter case this court said (at p. 283): "It is difficult to see, therefore, how she [the plaintiff] is in a position to invoke the equitable powers of the court to restrain the defendant from doing that which she is herself doing. A court of equity favors only worthy claimants."

The foregoing observations relate more particularly to what we consider was the failure of the learned trial court to properly weigh the testimony presented at the trial, resulting in findings of fact upon vital issues which we think were clearly contrary to the weight of the credible testimony given at the trial. The decision of the learned trial court being thus against the weight of the evidence, as we view it, furnishes ample ground for the disapproval of the court's findings, and leads to a reversal of the judgment appealed from and a direction of judgment in defendant's favor.

But we are of the opinion that, aside from the determination of the trial court of such vital issues, in no event did the plaintiffs prove a case entitling them to the equitable relief granted by the judgment appealed from. We are convinced that the facts proven by the testimony at the trial, and as found by the trial court upon the evidence, show conclusively that at the time defendant purchased the Booth and Healion stock the partnership had been fully dissolved; that such dissolution under the statutes of this State and under the common law occurred on June 11, 1919, at the conference between the partners when the plaintiff Samuel Bayer announced that under no circumstances would the plaintiffs continue the partnership of Bayer Brothers as then constituted. Upon such dissolution of the partnership any fiduciary duty which the defendant owed toward the plaintiffs while the copartnership existed ceased, and the defendant was free to purchase the Booth and Healion shares for his exclusive benefit, or to do anything else which he might deem prudent for his own protection.

Assuming for the moment that the plaintiffs had any interest in the Booth and Healion shares of stock which the defendant purchased, or that the purchase of said stock was within the scope

of the partnership business, and that, therefore, upon being acquired by the defendant, the said shares, during the existence of the copartnership, could only be held by him for the benefit of the copartnership, nevertheless, under the evidence and under the findings of fact made by the trial court, at the time such purchase was made the copartnership had ceased to exist as a going concern and defendant's duty of good faith toward his former associates was at an end. The learned trial court held that it was quite immaterial as to whether or not the copartnership had been dissolved at the time of the purchase by the defendant of the Booth and Healion stock. The trial court held that aside from the question as to whether or not the copartnership had been dissolved at the time defendant purchased said stock the plaintiffs were nevertheless entitled to the relief sought, because of the fact alone that the defendant had failed to reveal his purchase of the stock at the time when the formal agreements were executed terminating the copartnership affairs of Bayer Brothers in the latter part of October, 1919, and that because of such concealment on defendant's part the plaintiffs had unwittingly given to defendant a larger share of the production of the Montville Finishing Company than they would have given him had they known of his having acquired the Booth and Healion stock. As to this matter the learned trial court in its opinion said: " I am of the opinion that technically the copartnership was not dissolved at the time of the quarrel, but continued in existence until the formal agreement of dissolution but I cannot see that the plaintiffs' rights or the defendant's duty would be affected by a decision of this technical point. * * * And even if I should hold that the defendant would have had a right to obtain the additional shares of stock after the dissolution, yet unless the plaintiffs had by their own acts justified the defendant in obtaining a secret advantage in advance, they were entitled in common fairness to know when they made the contract of dissolution that the defendant had already obtained additional stock sufficient with the stock then delivered to him to give him a majority control of the corporation." (122 Misc. 10.) And the trial court, in its fifth conclusion of law found: " Even if it was the intention of the members of the copartnership prior to August 13, 1919, to dissolve it, the trust relation between them nevertheless continued in full force on August 13, 1919, and until the actual dissolution occurred on October 23, 1919."

We think the court clearly erred in making such finding. Upon every issue of fact the trial court found in accordance with the contention of the defendant, that the partnership had been dissolved prior to the purchase of the shares of stock in question by

the defendant. However, the trial court erred in erroneously refusing to conclude upon the facts as matter of law that the copartnership theretofore existing had been dissolved prior to the purchase by the defendant of said stock. It must be borne in mind that this action is brought by the plaintiffs to impress a trust upon the seventy-six shares of stock purchased by the defendant of Booth and Healion. The only question before the court is as to whether such purchase was at the time when it was made, lawful or unlawful. No rescission is sought here of the formal agreements terminating the copartnership which were entered into between the parties on or between October 22 and 25, 1919, on the ground that the defendant concealed from the plaintiffs the fact that he had purchased the Booth and Healion stock and thereby had obtained a greater proportion of the production of said corporation than the plaintiffs otherwise would have consented to give him. If the defendant might lawfully purchase the Booth and Healion stock when he did on August 13, 1919, then nothing he might thereafter do would affect the legality of his purchase. The fact, therefore, that the defendant failed to disclose to his former partners the fact that he had purchased the said stock, at the time of the execution of the formal agreements late in October, 1919, could have no retroactive effect or assail the validity of the purchase of said shares if said purchase was made after the dissolution of said partnership, as the court, from the excerpt from his opinion above quoted, seemed willing to assume. It is quite possible that the withholding of such information might be urged by the plaintiffs as a ground for rescinding the agreements entered into in October, 1919, but the plaintiffs are here asking no such relief.

We think the trial court clearly failed to distinguish the difference between a " dissolution " and a " termination " of the copartnership. The partnership of Bayer Brothers was one at will. It had no specific term to run. Being at will, it might be dissolved at the will of either of the partners on a moment's notice. Whenever either of the partners refused to continue longer for the mutual benefit of all the partners and made known his intention to cease doing business with his associates, at that moment, under well-considered decisions at common law and under the statute law of this State, the copartnership was at an end. All that remained to be done was to wind up the partnership affairs and to terminate the same. In a copartnership of the importance and varied interests of Bayer Brothers, time, of course, was required to terminate and wind up its affairs. At common law it is not unusual that the courts have failed carefully to distinguish between

First Department, February, 1926.     [Vol. 215

the terms " dissolution," " winding up " and " termination " of a
copartnership.    The plaintiffs, respondents, make much of the
clause contained in the agreement entered into between the plain-
tiffs and the defendant on October 22, 1919, wherein it was stated:
" That the said copartnership firm of Bayer Bros. be and is hereby
dissolved as of October 23, 1919, * * *."    Notwithstanding
the language thus used, the evidence is conclusive, and the trial
court found in accordance therewith, facts showing that the copart-
nership had in fact been dissolved months prior to the execution
of said agreement.  The scrivener who prepared said agreement
fell into the same error and loose use of the term " dissolved "
that had marked some of the ill-considered decisions of the courts
at common law.    If in truth the copartnership of Bayer Brothers
had been dissolved at a prior time, such statement in the articles
of agreement entered into in winding up the copartnership affairs
was of no moment and could not serve to retroactively revivify
that which was long since dead.    By the codification of the laws
of this State into the " Partnership Law " the Legislature by adopt-
ing the recommendations of the Commissioners on Uniform State
Laws wished to codify the clearer decisions of the courts at common
law, that thereby any confusion or ambiguity theretofore existing
might be forever removed.    As showing the intent of the Commis-
sioners on Uniform State Laws and that of our Legislature and as
an aid to the construction to be given to the sections of the Part-
nership Law as codified, the note of the Commissioners is helpful.
Concerning the pre-existing ambiguity and uncertainty in the use
of the terms " dissolution " and the " winding up " of partnership
affairs, the note of the Commissioners stated: " As used by the
legal profession the term ' dissolution ' designates, not only the
single act of the termination of the actual conduct of the ordi-
nary business, but also often the series of acts thereafter until the
final settlement of all partnership affairs.    It is also frequently
said that dissolution, although the word is used to designate only
the termination of ordinary business relations, terminates the part-
nership, it being at the same time explained that the partnership
thereafter continues to exist for the purpose of suing and being
sued in the process of winding up partnership affairs.    Certainty
demands that this confusion should be removed if possible.    In this
act dissolution designates the point in time when the partners
cease to carry on the business together; termination is the point in
time when all the partnership affairs are wound up; winding up,
the process of settling partnership affairs after dissolution."    (See
7 Greene's Uniform Laws, Annotated, 43, § 29, note.)    Thereupon
the Legislature adopting the Uniform Partnership Act, enacted as a

part of the present Partnership Law, section 60, which provides that " The dissolution of a partnership is the change in the relation of the partners caused by any partner ceasing to be associated *in the carrying on as distinguished from the winding up of the business.*" (Italics are the writer's.) And section 61 of the Partnership Law provides that " On dissolution the partnership is not terminated, but continues until the winding up of partnership affairs is completed." (See, also, Uniform Partnership Act, §§ 29, 30.)

It thus appears that the Legislature, following the clearer authority at common law, specifically distinguished between the dissolution and the winding up of a partnership business. A copartnership at will is dissolved at the moment when either of the partners expresses an intent not to continue longer, or when the partners decide to cease doing business for their mutual benefit. The partnership affairs, however, are not terminated until the winding up is completed. Their energies thereafter are devoted to the winding up of the business affairs of the copartnership and to reaching an agreement as to the distribution of its assets. Section 62 of the Partnership Law provides in subdivision 1 that dissolution is caused, without violation of the agreement between the partners, " (b) By the express will of any partner when no definite term or particular undertaking is specified, (c) By the express will of all the partners who have not assigned their interests or suffered them to be charged for their separate debts, either before or after the termination of any specified term or particular undertaking." (See, also, Uniform Partnership Act, § 31.) The will or intent of any of the partners to dissolve a partnership, or the mutual consent of all the partners to dissolve, may be shown by conduct as well as words. ( *Kennedy* v. *Porter*, 109 N. Y. 526; Rowley, Modern Law of Partnership, 732–734.) The findings of fact made by the trial court based upon the evidence given at the trial show conclusively that the copartnership of Bayer Brothers was dissolved prior to August 13, 1919. Not only did the words of the parties show an intent to dissolve, but the conduct of the parties following the conference on June 11, 1919, clearly demonstrated that the copartnership was dissolved prior to August 13, 1919. Not only did the plaintiff Samuel Bayer announce at the meeting held June 11, 1919, when all of the partners were present, that the copartnership could no longer continue with the defendant, but the court made findings of fact showing that an immediate and complete dissolution of the copartnership did actually occur. The court made the following specific findings of fact:

" *Twenty-eighth.* That in and during said month of June, 1919, differences arose between Samuel Bayer, his sons Henry and

Alexander Bayer, and his son-in-law Philip Bayer, on the one hand, and Nathan Bayer on the other, with respect to the business and affairs of said copartnership.

" *Twenty-ninth.* That at a meeting at the office of the said copartnership held on or about June 11, 1919, said differences were discussed and at such conference *Samuel Bayer announced that under no circumstances would these plaintiffs continue the partnership of Bayer Brothers as then constituted.* [Italics are the writer's.] * * *

" *Thirty-first.* That prior to the said conference, one Alexander A. Mayper had been, from time to time, acting as counsel and attorney for the said copartnership of Bayer Brothers.

" *Thirty-second.* That at or about the time of the conference the plaintiffs herein secured other counsel, to wit: one Max Silverstein, and then and there discontinued the services of the said Alexander A. Mayper as counsel for the said copartnership, and that the said Mayper continued as the attorney for Nathan Bayer, the defendant herein.

" *Thirty-third.* That prior to the said meeting in June, 1919, and for many years theretofore, defendant's principal duties, as a member of said copartnership, included the purchase of merchandise for and in behalf of the said copartnership.

" *Thirty-fourth.* That shortly after said meeting in June, 1919, this defendant, Nathan Bayer, was notified by Philip Bayer, one of the plaintiffs herein, that he must no longer purchase merchandise for and in behalf of the said copartnership.

" *Thirty-fifth.* That pursuant to the notice given to this defendant to cease purchasing merchandise, this defendant did not purchase any merchandise for and in behalf of the said copartnership at any time after the said meeting in June, 1919.

" *Thirty-sixth.* That after the said meeting in June, 1919, this defendant was not permitted to continue the full performance of his duties as such copartner. * * *

" *Thirty-eighth.* That during the months of July, August, September, and for the better part of the month of October of 1919 and up to the date of the execution of the October agreements, hereinafter referred to, said copartnership of Bayer Brothers made no purchases of merchandise for the conduct of its said copartnership business; and entered into no contracts for the purchase of merchandise.

" *Thirty-ninth.* That prior to the said meeting in June, 1919, all checks of the copartnership were signed by either Samuel Bayer or Nathan Bayer, and the said Nathan Bayer had been duly and fully authorized and had been granted full power to sign and

execute checks in behalf of the copartnership and in the conduct of said copartnership business.  *  *  *

"*Forty-second.* That the only checks signed and executed by the defendant after the said meeting in June, 1919, were not exceeding approximately five certain personal checks, constituting personal withdrawals of said defendant Nathan Bayer, and chargeable against the said defendant personally on account of his interest in the assets of said copartnership.

"*Forty-third.* That shortly after the said meeting in June, 1919, the said copartnership and its members devoted and continued their efforts towards winding up the partnership affairs.

"*Forty-fourth.* That the business interests of the said copartnership were extensive and that the said copartnership had been conducting business on a large scale.

"*Forty-fifth.* That its merchandise inventory was substantial; that its bills receivable and other items in the copartnership assets aggregated hundreds of thousands of dollars and that the said business required several months for the process of winding up.  *  *  *

"*Forty-seventh.* That at said meeting in June, 1919, the differences were of such serious nature that *it was apparent to all in attendance that said copartnership would no longer be continued.* [Italics are the writer's.]  *  *  *

"*Fifty-second.* That after the month of June, 1919, this defendant, in fact, did not bind the copartnership or assume any obligations in its behalf, nor did he perform any duties as such copartner, except in so far as to render such service and assistance as was required by the plaintiffs or otherwise required in the process of winding up the copartnership business.

"*Fifty-third.* That prior to the 13th day of August, 1919, and in and during the month of August, 1919, a conference took place at the office of Alexander A. Mayper, at which were present Alexander A. Mayper and Nathan Bayer on the one hand, and Philip Bayer and Alexander Bayer and one Max Silverstein, their attorney, on the other hand, and also one Israel Unterberg."

Notwithstanding the foregoing findings of fact, which we deem conclusive as showing a *dissolution* of the partnership immediately upon the conference between the partners on June 11, 1919, the court refused to find that there was any dissolution of the partnership at that time. At common law we think such dissolution took place at and immediately after June 11, 1919. It is difficult to see how the partners could have more effectively acted to show an intent and understanding that the partnership of Bayer Brothers was at an end as a going concern, than they did from

and after the June meeting in 1919. No more of the business of the general partnership was transacted after that date. The general counsel of the copartnership was discharged and new counsel hired to represent the plaintiffs, while the defendant retained the old counsel. Prior to the June meeting the defendant's principal duties had been to purchase merchandise in behalf of the copartnership. Directly after this meeting he was told that he must make no more such purchases, and he thereupon ceased and made no further purchases after the June meeting. He was not permitted to further continue in the full performance of his duties as a partner. During the months of July, August and September, 1919, and up to the date of the execution of the October agreements no purchases were made of merchandise in behalf of the copartnership of Bayer Brothers in the conduct of its copartnership business, and during those months the copartnership entered into no contracts for the purchase of merchandise. Prior to the June meeting checks of the copartnership were signed either by the president, Samuel Bayer, or by the defendant Nathan Bayer, the latter having been duly and fully authorized to sign and execute the checks in behalf of the copartnership and in the conduct of the copartnership business. Following the June meeting the only checks signed by the defendant were not exceeding approximately five personal checks constituting personal withdrawals of the said defendant and chargeable against the defendant personally on account of his interest in the assets of the said copartnership; the said copartnership and its members devoted and continued their efforts toward winding up the partnership affairs. Following the June meeting the defendant did not bind the copartnership or assume any obligations in its behalf, nor did he perform any duties as such copartner, except in so far as to render such assistance as was required by the plaintiffs or from others in the winding up of the copartnership business. All of the foregoing facts were found by the trial court, the trial court only refusing to find upon such facts that there was a dissolution of the copartnership at and immediately following the conference on June 11, 1919. We deem the law so well settled as to leave no doubt that the learned court below erred in refusing to find that a dissolution occurred in June, 1919, and that from that time forward the defendant owed no fiduciary duty toward his former associates, but was privileged to take any steps which he deemed prudent for the protection of his personal interests. In *Kennedy* v. *Porter* (109 N. Y. 526) our Court of Appeals held that the fact that the firm had stopped making purchases was in itself most convincing evidence that the partnership theretofore existing had been dissolved, and that an

agreement to distribute certain stock " was not at all inconsistent with the theory that the firm had been previously dissolved, *for a firm always continues to exist for the purpose of collecting, settling up and distributing its assets and performing its antecedent engagments.*" (Italics are the writer's.)   In *Pearce* v. *Lindsay* (3 DeG., J. & Sm. 139) it was held that " Determination of an agreement of the nature of a partnership at will held to result from the *animus* of the parties towards each other without any formal notice."   In Lindley on Partnership (9th ed. p. 677) it is stated: " A dissolution of a partnership at will may be inferred from circumstances, *e. g.,* a quarrel, although no notice to dissolve may have been given." Under these authorities any word or act manifesting intention on the part of either partner to discontinue the business as a going concern for the mutual benefit of all the partners constitutes sufficient notice upon which the trial court might reach a conclusion that the partnership was dissolved as a matter of law.   A partnership at will may be dissolved at a moment's notice by either party. (Lindley Partnership [9th ed.], 675, 676; 30 Cyc. 650–658.)   Cyc., above cited, states the rule that " Where no fixed term has been agreed upon for the duration of the partnership, any partner may dissolve it at any time by notice of his intention to do so to all the other partners.   *   *   *   A partnership at will is terminated at the time when notice is given."   In *Crawshay* v. *Maule* (1 Swans. 495) the court said (at p. 508): " The general rules of partnership are well settled.   Where no term is expressly limited for its duration, and there is nothing in the contract to fix it, the partnership may be terminated at a moment's notice by either party."   The evidence presented at the trial was, in our opinion, entirely sufficient to show that the partnership was dissolved before August 13, 1919, and that any conclusion to the contrary was erroneous.   Not only did it appear from the transactions at the meeting on June 11, 1919, that there was a disagreement between the copartners and an unwillingness to longer continue as a going concern, and that a deep animus existed on the part of the plaintiffs toward the defendant, but that all the parties understood from that time forward the copartnership, as a going concern, was at an end.

The copartnership being at an end prior to August 13, 1919, the defendant was permitted to purchase the Booth and Healion stock, and the fiduciary obligation theretofore existing toward his associates was at an end.   (Lindley Partnership [8th ed.], 365; *Kennedy* v. *Porter,* 109 N. Y. 526; 30 Cyc. 459.)   Cyc. thus states the rule: " With the dissolution of the firm, the confidential relationship of the partners ceases, so far as new transactions are concerned, and the former partners are at liberty to compete with each other,

in buying property, in taking leases, or in making contracts precisely as though they had never been partners."

The case of *Tygart* v. *Wilson* (39 App. Div. 58) sustains in principle the contention of the defendant, appellant, herein. In that case the copartnership agreement provided that either partner might dissolve the partnership at the end of the fiscal year upon giving three months' written notice of such intention. In April the plaintiff orally notified the defendants that he was going to withdraw from the firm on the first of May following. On May first the plaintiff in accordance with the partnership agreement gave formal written notice to the effect that he would withdraw from the firm on December first following. After the giving of such notice and prior to December first the defendants entered into negotiations with the landlord for a renewal of the former lease and secured such renewal prior to December first. The plaintiff brought action similar to the action by the plaintiffs at bar to have the defendant declared a trustee of the renewal. The court held that inasmuch as the plaintiff had given notice that he would retire from the firm on December first, the defendants were free to take a renewal of the lease for their own benefit even though such renewal was obtained before December first. In distinguishing certain decisions in opposition to the holding of the court the Appellate Division said (at p. 62): " In the case before us the partnership, like that in *Struthers* v. *Pearce* [51 N. Y. 357], was not fixed and definite, but it was to continue during the pleasure of the parties; unlike that case, however, notice had been given by the plaintiff of the termination of such partnership at a fixed time, and at the time of the negotiations the partnership existing between the parties was not ' a continuing partnership of undetermined duration.'

" In this case the lease would expire on the first of May. Prior to, or about, the first of April the plaintiff notified the landlord that the copartnership existing between him and the defendants would terminate on May first; that he would withdraw from the firm on that date, and that he would not be responsible for the rent of the premises after that time. He also, before the first of May, notified the defendants that he would retire from the copartnership May first; ascertaining or recalling the fact, however, that he could only do so under the articles of copartnership, at the end of the fiscal year and by giving three months' written notice, he on the first day of May gave them written notice that he would withdraw from the copartnership on the thirtieth day of November or the first of December, and he again, on November nineteenth, notified the landlord that the copartnership contract would expire November

thirtieth, that he would then retire from the firm and he would not be responsible for the rent after that time.

" After giving these notices I do not see how it can be claimed that he could expect any renewal of the lease for his benefit. It seems to me that they constituted an abandonment of the so-called ' tenant's ' right of renewal."

The foregoing language of the Appellate Division well illustrates the rule that the fiduciary duty which one partner owes to another may cease even before an actual dissolution if notice of an intent to dissolve the copartnership be already given and if the parties understand and intend that the firm is to be dissolved. Whether, in the case at bar, the firm of Bayer Brothers had been technically dissolved or not when the defendant purchased the Booth and Healion stock, nevertheless, both by word and by the conduct of the copartners it was understood by all, as the trial court found, that as soon as the business of the partnership could be wound up and the terms of the distribution of its assets agreed upon, the copartnership was to be finally terminated. Even though there was not a technical dissolution at the time defendant purchased the shares of stock, we think the defendant was free to make such purchase for his exclusive benefit, and that at that time he owed no duty to the copartnership to purchase the shares for its benefit. Under the finding of the trial court that by the acts of the parties they manifested an unequivocal intention to dissolve their previous relations and that the partners, immediately after the June meeting, proceeded to wind up the affairs of the copartnership and thereafter transacted no business for which the partnership was created, we think there was no legal or moral obligation on the part of the defendant to purchase said shares for the benefit of the firm. From and after June 11, 1919, the plaintiffs on the one side and the defendant on the other proceeded to make arrangements to carry on each an individual business and took whatever steps each deemed best for his and their welfare. Even though we assume, contrary to the facts as we shall hereinafter point out, that the purchase by the defendant of the Booth and Healion stock was within the scope of the copartnership affairs, and assuming that such purchase was made without the consent of the plaintiffs, nevertheless, such purchase occurred after the dissolution of the copartnership, and the trial court erred in impressing a trust on the shares purchased by the defendant for the benefit of his former firm.

Further, even if we assume that there was no dissolution prior to August 13, 1919, and that the partnership continued until the execution of the agreements and the distribution of the assets on October twenty-second and twenty-fifth, and that the partner-

ship continued after June 11, 1919, as a going concern, we still do not think that the defendant owed any duty of exercising good faith toward his former associates in the matter of the purchase of the stock in question. The shares in question were never the property of the copartnership. The copartnership had no interest therein, and in our opinion their purchase by the defendant was not within the scope of the partnership affairs. Nor do we think it important that the purchase of the Booth and Healion stock was made by the defendant secretly. The secrecy was imposed by Booth and Healion themselves because of their desire that nothing be done which might affect their standing with the plaintiffs. The fact that Booth and Healion imposed upon defendant the condition that he should not disclose his purchase to the plaintiffs, and that pursuant to such condition the defendant did not disclose his purchase to the plaintiffs until after the final liquidation of the partnership affairs in October, 1919, does not, we think, invalidate the defendant's purchase, if otherwise lawful when made. Unless the purchase by the defendant of said shares was a purchase of assets of the corporation or a purchase made within the scope of the partnership business, such purchase was of no concern to the plaintiffs. It was immaterial whether it was made openly or secretly. (*Trimble* v. *Goldberg*, L. R. [1906] A. C. 494.) In *Trimble* v. *Goldberg* the defendants secretly purchased property of the corporation in which the plaintiff and defendants as copartners owned a large interest. The Court of Appeal held that the defendants purchased said property as trustees for the copartnership, stressing the fact that the purchase was made secretly. The Privy Council reversed the Court of Appeal and pointed out the immateriality of the secrecy under which the purchase was made, stating (at p. 500): "The Court of Appeal seems to have been much impressed by the secrecy of the transaction. No doubt it would have been better if Goldberg had been told at the time that Trimble and Bennett were making this purchase. * * * But still there was no legal obligation on Trimble or Bennett to tell Goldberg what they were doing unless he had a right to take part in the speculation if he chose to do so." So in the case at bar, Booth and Healion had a perfect right to sell their stock as they might see fit and had the right to impose any conditions which to them seemed proper as a condition of their selling their stock to the defendant. They imposed the condition that he should not disclose the fact of his purchase to the plaintiffs. The defendant was under no duty to disclose said purchase to his copartners unless the purchase was made within the scope of the partnership or was a purchase of partnership assets in which the copartners had a right to share

if they so chose. Surely this purchase by the defendant was not a purchase within the scope of the partnership affairs and was certainly not a purchase of any asset of the partnership itself. The purchase being entirely without the scope of the partnership business, the fact that it was secretly made was of no consequence. It follows, therefore, that the defendant was entitled to purchase the Booth and Healion stock for his own benefit, and could do so secretly. If he was not entitled to purchase such shares for his own benefit his purchase thereof openly would in nowise have altered his legal duty. There can be no question as to the duty of one copartner toward his fellows. He must exercise at all times the utmost good faith toward those with whom he is associated. While the copartnership is in existence he may not secretly obtain any undue advantage over his copartners. In purchasing the Booth and Healion stock the defendant did not enter into any competing business with his copartners. The purchase was made from his private funds and not from the firm property. The purchase of these shares could not affect the interests of his copartners during the existence of the copartnership. The stock purchased was not an asset of the copartnership. Defendant did not use any information which he had obtained in the course of the copartnership business for any purpose within the scope of the partnership affairs in making the purchase. He merely bought shares of stock in a corporation in which the partnership owned two-thirds of the capital stock. We think in so doing the defendant violated no duty to his copartners under the provisions of the Partnership Law. The purchase by the defendant was certainly not within the scope of the partnership business. To hold that it was within the scope of the partnership business would be tantamount to holding that a partner may not purchase shares of stock in a distinct corporation whenever his partnership had dealings with said corporation, and when the partner believed that as a result thereof the business of the corporation would flourish and prosper. There was no agreement between the copartners that neither of them should purchase the shares of stock of the Montville Finishing Company and, therefore, the purchase by the defendant may not be said to have been within the scope of the partnership affairs. (Lindley Partnership [9th ed.], 396, 398, 401; *Cassels* v. *Stewart,* L. R. 6 App. Cas. 64; *Trimble* v. *Goldberg, supra.*) In *Trimble* v. *Goldberg* the facts were practically identical with those in the case at bar. The plaintiff and two defendants there entered into a copartnership agreement for the purpose of buying and reselling property. The copartnership purchased 5,500 shares of a certain corporation besides stands or plots of land for building purposes. Thereafter

the two defendants secretly bought all the other lands of the corporation for their own benefit. The plaintiff brought action to impress a trust upon the property of the corporation thus bought by the defendants. The Privy Council in reversing the judgment of the trial court and the Court of Appeal held that the defendants were free to make such purchase for their own benefit, saying (at p. 499):

" It seems to their Lordships that the judgment of the Court of Appeal is not well founded. The purchase was not within the scope of the partnership. The subject of the purchase was not part of the business of the partnership, or an undertaking in rivalry with the partnership, or indeed connected with it in any proper sense.   *   *   *

" Now if the purchase from Hollard had been completed so far as to make the partnership the absolute and unincumbered owner of the 5,500 shares in the Sigma Syndicate, and if those shares had been divided between the three partners and registered in their separate names, any one of the three would have had as good a right to buy any property of the syndicate which the directors might think fit to offer for sale as any other shareholder in the syndicate or any member of the general public.

" The Court of Appeal appears to have regarded the purchase in question, though not expressly prohibited by the partnership articles, as a breach of good faith and consequently as a violation of the fundamental condition of the partnership. Suppose it had been forbidden in express terms, what would have been the result? The other partner or partners discovering the breach of contract might have claimed immediate dissolution, or even damages, on proof of actual loss to the partnership. But a claim to share in the profits of the forbidden purchase would not have been warranted by principle or precedent. And here there was no loss to the partnership; only a disappointment to the partner left out in the cold,   *   *   *."

In *McKenzie* v. *Dickinson* (43 Cal. 119) the plaintiff and defendant were partners and the defendant for a counterclaim to plaintiff's action pleaded that the plaintiff had secretly bought up a judgment against the defendant, and that the plaintiff had obtained knowledge of such judgment in the course of the partnership business, and that upon such judgment thus obtained by the plaintiff the plaintiff had caused execution to be levied upon the defendant's interest in the copartnership and had the interest sold, and had purchased said interest for his own benefit. It was the claim of the defendant that the plaintiff had thus breached his fiduciary relation to the defendant and that the plaintiff held the

share so purchased for the benefit of the defendant. The court held against the contention of the defendant, saying (at p. 133): " I know of no principle of equity which forbids one partner from purchasing with his own funds a judgment or other evidence of indebtedness, even against one who may be at the time his own copartner in business, or prohibiting him from enforcing the collection by a levy upon and sale of the interest of the other in the firm assets. The obligations of copartners *inter sese,* whatever may be their nature and extent, refer only to the conduct of the business in which the firm is engaged. The copartnership of McKenzie & Co. was engaged in the business of manufacturing and selling bags, and buying and selling bagging material in San Francisco. It was not engaged in purchasing judgments or other securities, and whatever transaction either partner might effect in that respect, by the use of his private means, would be for his own benefit, and not for the benefit of the copartnership." (See, also, to the same effect: *Aas* v. *Benham,* L. R. [1891] 2 Ch. Div. 244; *Latta* v. *Kilbourn,* 150 U. S. 524.) In the case last cited the United States Supreme Court held against the contention of the plaintiffs that the defendant in making certain purchases of real estate had violated his duty toward the plaintiffs, and denied plaintiffs' prayer that the defendant be held to be a constructive trustee of the profits realized by him for the benefit of his firm. At page 549 Mr. Justice JACKSON, writing for the United States Supreme Court, said: " It is well settled that a partner may traffic outside of the scope of the firm's business for his own benefit and advantage, and without going into the authorities it is sufficient to cite the thoroughly considered case of *Aas* v. *Benham,* 2 Ch. D. 1891, 244, 255, in which it was sought to make one partner accountable for profits realized from another business, on the ground that he availed himself of information obtained by him in the course of his partnership business, or by reason of his connection with the firm, to secure individual advantage in the new enterprise." The United States Supreme Court cited with approval the opinion of Lord LINDLEY in *Aas* v. *Benham (supra)* that if " he [a partner] uses the ·information for purposes which are wholly without the scope of the partnership business, and not competing with it, the firm is not entitled to an account of such benefits." We are, therefore, of the opinion that even assuming that the copartnership of Bayer Brothers was undissolved at the time defendant purchased the Booth and Healion shares, nevertheless said purchase was not of any property in which the partnership was interested, nor was it within the scope of the partnership business. We think the defendant was free to make such purchase as he did.

First Department, February, 1926.                    [Vol. 215

One other circumstance, we think, precluded the trial court from granting the plaintiffs the equitable relief it did in the judgment appealed from, and to which we think we should make reference. The evidence upon the trial established and the court found that the sale of the Booth and Healion stock to the defendant was upon the express condition and understanding that the defendant would not sell, transfer, assign or set over said shares of stock so purchased to any one without giving to Booth and Healion first an opportunity to repurchase said shares at the same price which the defendant paid therefor. Booth and Healion were at liberty to attach such a condition to their sale of the stock to the defendant. The learned trial court found that Booth and Healion owned their shares in their own right, and that they appeared as stockholders of the Montville Finishing Company on the books of that corporation; and that the eighty shares of stock which they held was their absolute property, and that they had full power to dispose of such shares upon such terms and conditions as they desired. Booth and Healion were not made parties to the present action, and it is difficult to see how the right to the stock in question could be adjudicated adversely to the contentions of the defendant, except with the presence of Booth and Healion as parties to the action. The trial court in his opinion expressed serious doubt whether Booth and Healion were not necessary parties. The court, however, held that if the defendant was chargeable with bad faith in making the purchase for his own benefit, then as a matter of law Booth and Healion were chargeable with entering into an agreement to do something regarded in law as wrong and that, therefore, they were not innocent parties, and that a court of equity could transfer their property without joining them as parties defendant. The trial court held that while they were proper parties they were not necessary parties. The court was also of the opinion that any decree which might be entered herein declaring that the defendant held lawful title to the stock as trustee for his copartners could not affect Booth and Healion's rights to bring an action against the defendant to enforce any rights which they might possess. We are of the opinion that if Booth's and Healion's rights were unaffected by the decree herein and if they might still bring action to enforce their rights against the defendant, such fact furnishes the best of reasons why they were necessary parties as well as proper parties to the present action. If the present decree is to prevail the defendant must hold the stock in question as trustee for his copartners and himself. If Booth and Healion assert their rights under their agreement with the defendant at the time of his purchase of their stock, then the defendant will be exposed

to the claim of Booth and Healion that in obeying the decree appealed from he violated his agreement with them, that they have the first right to purchase said stock.   If the court should sustain such contention of Booth and Healion then the defendant would be doubly punished.   Under such circumstances we think there can be no question but what Booth and Healion were not only proper but necessary parties to the action.   In 21 Corpus Juris, 273–276, the rule as to necessary and indispensable parties is thus laid down:

" Necessary or indispensable parties are those without whom the court will not proceed to any decree, even as to the parties before it.

" This class includes all persons who have an interest in the controversy of such a nature that a final decree cannot be made without either affecting their interests or leaving the controversy in such a condition that its final termination may be wholly inconsistent with equity and good conscience.   \*   \*   \*   The term ' necessary parties ' also includes persons who, while not necessary or indispensable on account of their own interest, yet are so connected with the subject matter of the controversy that it is necessary to have them before the court for the proper protection of those whom the decree will necessarily and directly affect."

In *Mahr* v. *N. U. F. Ins. Society* (127 N. Y. 452) the Court of Appeals was considering an action to restrain the insurance company from paying out the amount of the loss to the assured or his assign, the plaintiffs claiming to be equitable owners of the policy.   The insured resided in Iowa.   He sent the plaintiffs the policy as a collateral for a loan, but had never formally assigned the policy to the plaintiffs.   A fire occurred which destroyed the property, and the insured made a formal assignment of the policy to one K. in Iowa.   The plaintiffs in their action here made personal service upon the insured and the insurer, but not upon K., the assignee, in Iowa.   The defendant pleaded a defect of a necessary party defendant.   In the meantime K. brought action in Iowa against the insurance company on the same policy.   The insurance company obtained an order here requiring K. to be a party defendant in the action in this State.   The plaintiffs served K. by publication, but not personally.   The trial court held that the assignment to K. was void and that he had no interest superior to the plaintiffs'. Judgment was entered restraining the insurance company from paying out the amount of the policy to any one save the plaintiffs. In reversing the judgment the Court of Appeals said (at p. 458):

" The main question left for decision is whether Kelly was a necessary party, as the defendant company alleged in its answers

and urged upon the trial. * * * While the statute does not in terms prohibit the court from determining the controversy, unless all the necessary parties are brought in, that is impliedly commanded and is the established practice in all equitable actions. * * *

" It is not enough for the court to direct that the necessary parties be brought in, but it should refuse to proceed to a determination of the controversy, so as to affect their rights until they are in fact brought in. * * *

" The general rule in equity requires that all persons interested in the subject of the action should be made parties, in order to prevent a multiplicity of suits and secure a final determination of their rights. * * *

" Not only all persons whose rights may be affected by the judgment should be brought into court, but all whose presence is essential to the protection of any party to the action."

We are of the opinion that Booth and Healion were not only proper but indispensable parties defendant to a complete adjudication herein, and that the failure to make them parties precluded the granting of the judgment appealed from.

For the reasons above stated, the judgment appealed from should be reversed, with costs, and plaintiffs' complaint dismissed, and judgment directed for the defendant, with costs.

CLARKE, P. J., FINCH and MARTIN, JJ., concur; BURR, J., dissents.

Judgment reversed, with costs, plaintiffs' complaint dismissed, and judgment directed for the defendant, with costs. Settle order on notice.