Dore, J.
On these appeals, the main issue is whether defendant George Seager, when he withdrew from the corporation he and plaintiff owned in equal shares, violated a fiduciary duty by improperly appropriating to himself a valuable corporate asset.
To understand the issues, we must first identify various persons and organizations involved. Plaintiff, Washer, and defendant, Seager, were the sole stockholders, officers and two of the , directors of defendant Vanetta Sportscloth Corporation organized by Washer and Seager in November, 1941, to buy, convert and sell textile fabrics chiefly in sports apparel. Each owned 50% of the common stock. MeCampbell & Company, Incorporated, was sales agent for a textile mill distributing to converters a new fabric suitable for sportswear, made of rayon and aralac, which was not the subject of priority regulation; MeCampbell supplied such fabric to Sportscloth relying on Seager’s personal skill in converting and merchandising the product. After Seager withdrew from Sportscloth, McCampbell supplied and sold the same fabric to Seager’s corporation, Seaglow' Fabrics Corporation, organized in May, 1943, and to Seaglow Textile Co., a limited partnership formed in October, 1944, with Seager and defendant Kamber as general partners. Grayhampton Corporation was organized in July, 1943, to factor the accounts of Seaglow Fabrics and Seaglow Textile.
Of the five causes of action alleged, only two, the first and third, need be considered, as the others were dismissed, and from such dismissal plaintiff does not appeal. In the first cause of action plaintiff charges Seager alone with, violation of his duties as an officer and director of Sportscloth and alleges that Seager organized Seaglow and Textile to purchase from MeCampbell the aralac fabric MeCampbell sold to Sportscloth and to divert from Sportscloth its major source of supply of merchandise and force it to liquidate.
The third cause of action charges a conspiracy between Seager and other defendants, except Sportscloth, to injure and *300 destroy the business of Sportscloth by diverting its supply of essential fabric to Seager and his organizations.
After a trial at Special Term, the trial court directed judgment on the first cause of action against defendant Seager; and on the third cause of action against Seager and Kamber individually and as partners of Textile, and against defendant Seaglow, and directed Seager, Kamber and Seaglow to account to defendant Sportscloth “ through the plaintiff and to the plaintiff ”, and appointed an official referee to take and state the account. The court dismissed the third cause of action against defendants McCampbell and Grayhampton.
Defendants Seager and Kamber, individually and as partners of Textile, and defendant Seaglow Fabrics, appeal from the judgment in plaintiff’s favor. Plaintiff appeals from so much of the judgment as dismissed the third cause of action against McCampbell and Grayhampton.
By a written stockholders’ agreement made between Washer and Seager on December 15, 1941, shortly after Sportscloth corporation was organized, the parties agreed that neither would sell his stock without giving written notice by registered mail to the other, that if there was a dispute as to the price either could elect to submit the dispute to arbitrators, and if the purchaser, after arbitration, failed to pay therefor, the seller could sell to anyone or insist that the corporation be liquidated. In the event of dissolution, the name Vanetta was to remain with Washer, who owned several other companies with that name. No time limit was provided so that either party could withdraw from the corporation at any time. The agreement contained no covenant that either party was not to engage in the same or a similar business after withdrawal.
For many years Seager had experience in dealing with textile fabrics used in the sportswear trade. He was to do the work incident to obtaining sources of supply, converting the fabric, and supervising sale and distribution thereof. Washer in his complaint says that he was not familiar with the converting of fabrics such as Sportscloth and other textile fabrics with which Seager was familiar. Seager was to manage the business, and plaintiff the finances which were not very extensive.
The agreement between the parties was at will and provided for a salary to Seager only, who had to give his whole time to the business; but in November, 1942, Washer demanded a salary. Seager objected and the parties agreed that Washer was to withdraw; but this agreement was canceled and Seager con *301 sented to Washer’s receiving a weekly salary of $62.50. Until late in 1942 the business did not show a profit; but thereafter there was a profit, and in February and March, 1943, each of the parties drew equal sums out of the profits and Seager used the $7,500 he drew, in part, to pay for the balance of the purchase price of shares of stock for which he had subscribed.
In March, 1943, there was another dispute about salaries, and on April 7, 1943, Seager told Washer that he was withdrawing from the corporation, and Washer replied: “ All right, George ”, and later requested Seager to put the withdrawal in writing, according to their agreement, and Seager wrote the letter as requested. Seager testified that Washer had said “ All right, George; I will buy you out ”. Washer denied this, but plaintiff’s exhibit, a letter from Seager to Washer, dated April 8, 1943, supports Seager’s version.
The same day, April 7, 1943, after Seager’s notice of withdrawal, Washer promptly went to McCampbell, saw its credit man, told him that Seager was withdrawing, and asked would it make any difference in the relationship. Washer was told that he would have to see Storm, McCampbell’s sales manager. Plaintiff testified Storm informed him on April 12, 1943, that McCampbell had pledged itself to Seager. Storm denied this and his denial was corroborated by McCampbell’s credit man, De Vries. On April 8th Seager wrote Washer and offered to sell his stock to Washer.
Thereafter both parties appointed arbitrators pursuant to their agreement. The arbitrators fixed the price at $15,000, but Washer wrote Seager that he would not purchase Seager’s stock and that the corporation would proceed to liquidate.
Plaintiff testified he subsequently saw Storm early in May seeking fabric to complete the orders which Sportscloth had on hand. Under certain conditions Storm agreed to furnish such fabric and on May 6th plaintiff wrote McCampbell his understanding of further dealings with McCampbell: that the Sportscloth Corporation “ will accept -no further orders for the fabrics ” McCampbell had been supplying but that McCampbell would supply Sportscloth.“ in the liquidation of our business, to fill the orders on hand ”. In subsequent correspondence McCampbell made it clear that it would supply the goods to enable Sportscloth to liquidate provided that the processing and distribution were under Seager’s direction.
Defendant Kamber was a stockholder, officer and director in Kamber & Masket, Inc., engaged in the business of manufacturing sportswear and had been manufacturing garments *302 from McCampbell’s fabric which Kamber purchased from Sportscloth. On learning of Seager’s withdrawal, Kamber negotiated with Storm to secure a supply of the fabric but McCampbell refused because of Kamber’s lack of experience in converting the material. On Kamber’s suggestion that he get Seager to convert, Storm said that he would consider selling to Kamber. Seager and Kamber went to McCampbell and upon Seager’s promise to do the converting, Storm sold 57,000 yards of the fabric to Kamber and shipped them between April 26 and May 4, 1943. There is nothing to indicate that Kamber did anything wrongful to induce the decision on the part of 'McCampbell. Kamber was anxious to insure a supply of the fabric and negotiated to that end as he had a right to in protection of his own business.
' In the early part of May, Kamber decided to go into business with Seager. Seaglow Fabric Corporation was incorporated in May, 1943. Thereafter an arrangement was made with McCampbell whereby fabric purchased by Kamber from McCampbell was transferred to Seaglow. McCampbell then did business with Seaglow.
. In July, 1943, Seager instituted a proceeding to compel dissolution of the Sportscloth corporation; Washer stated he was liquidating as rapidly as possible; and the petition was dismissed without prejudice to a plenary action.
In August, 1943, Washer commenced an action against Seager 'for specific performance to compel him to sign certain checks; Seager counterclaimed for dissolution. Seager signed all the ,, checks in January, 1944, and both parties turned in their preferred stock to Sportscloth which paid them par value therefor.
In April, 1945, in the action for specific performance, Seager moved for summary judgment dismissing the complaint as all the checks had been signed, and also for judgment on his • counterclaim which sought to direct Washer to complete the liquidation. Then for the first time, two years after Seager’s notice of withdrawal, Washer stated that the liquidation could not be completed as he was instituting an action on behalf of the corporation. He then served the summons and complaint in this action.
Under the stockholders’ agreement, either Washer or Seager had. the right to request the other to purchase his stock, in default whereof the proposed vendor could sell to others or bring about a dissolution of Valletta Sportscloth Corp. On April 7, 1943, Seager informed Washer that he was requesting him to buy his stock (formal written notice thereof was *303 given on the following day), and he told Washer, in effect, that he wanted to dissolve the corporation unless Washer purchased his shares. In acceding to this demand, Washer may have been bowing to the inevitable, but, by acquiescence, he recognized that Seager had the right to terminate his connection with the corporation in that manner. From then on, it is clear that Seager was under no duty to devote himself to the future business of that corporation.
There was no negative covenant preventing Seager, after he withdrew, from engaging in the same business. McCampbell, the supplier of the sportswear fabric, aralac, had no continuing contract with Sportscloth Corporation or with Washer or Seager to supply any amount of its fabrics to any of them at any time. The business was done on the basis of separate orders.
The facts clearly indicate, and plaintiff admitted, that McCampbell dealt with Sportscloth Corporation only because of its confidence in Seager. The fabric supplied was a new one, and McCampbell’s policy was to place it with converters who were best qualified by experience to convert and to sell and promote. During the relatively brief relationship, Seager had secured a source of supply and furnished the required skill in converting and marketing the goods. Therefore, when, with Washer’s knowledge and consent, Seager stated that he would withdraw, McCampbell had the right to decide whom it would serve. As Washer was not an expert converter, but enly the financier in the business, McCampbell refused to send its new fabric to him or the corporation without Seager’s skill to supervise the converting and merchandising. The decision was made in McCampbell’s best interest without any conspiracy or malice and was entirely lawful (Locker v. American Tobacco Co., 121 App. Div. 443, 451, affd. 195 N. Y. 565).
Once McCampbell made its decision not to deal further with Washer or the corporation on Seager’s withdrawal, there no longer existed any corporate opportunity or expectancy. Seager was not guilty of any breach of fiduciary duty when he determined to remain in the textile business —his lifelong work — and to continue to deal with McCampbell.
In Crittenden & Cowles Co. v. Cowles (66 App. Div. 95), a similar feud existed between the two sole directors of a corporation which occupied a store under a lease assigned to it by a former lessee. The landlord, after seeing both sides, refused to lease to the corporation and made a lease the same day with the defendant, one of the directors. ' The refusal of the *304 landlord to accept the corporation as a tenant was held by the Third Department to cut off any “ expectancy ” of renewal of the lease and the court said (pp. 96-97): “ I see no reason in law or equity in excluding a copartner or a director in a corporation from dealing with the landlord in respect to the premises after g, renewal to the occupying tenant has been refused by the landlord.”
In Bayer v. Bayer (215 App. Div. 454, 461, 469, 471, 477), this court held that, when partners disagreed and determined to discontinue the business, the partnership was dissolved and the defendant violated no fiduciary duty by purchasing shares of stock of a corporation two thirds of whose shares were held by the partnership. It was also held that plaintiffs were guilty of attempting to consummate the very same acts for which they assailed the defendant and since the partnership was at an end, though not formally wound up, the fiduciary relation was also at an end. On all the facts and circumstances here disclosed, the reason for the rule in that case may be applied by analogy in this where no rights of creditors or third parties are involved but the controversy is between the two coequal owners of the business who by reason of their agreement dealt with each other for all practical purposes as if the business was a partnership between individuals.
We think, too, that Washer had acquiesced in the termination of the relationship and in Seager’s taking up the business with McCampbell. After Washer knew that McCampbell would no longer serve the corporation and knew that Seager had organized Seaglow Fabrics, he consented to continue to liquidate the corporation and, in answer to Seager’s petition for specific performance to compel him to complete the liquidation, Washer swore in August 1943 that the parties had “ agreed * * * - to liquidate ”, had “ entered into such liquidation ” and that it was being conducted and “ has been largely effected * * V’ In fact, Washer did business with Seager in canalizing some of Washer’s products through Seager’s new corporation, Seaglow, when Washer had labor trouble. It was not until April 1945, long after Seager, to Washer’s knowledge, had organized his own company and had been doing business with McCampbell, that Washer commenced this action.
If there was no corporate opportunity surviving Seager’s withdrawal, and Seager was not guilty of violating any fiduciary duty, the other defendants were obviously not guilty of co-operating in any such violation. On this record we think the facts establish, contrary to the findings of the trial court, that Seager *305 did not breach any fiduciary duty in dealing with McCampbell; that there was no deceit or disloyalty, and that, in the absence of Seager’s skill, McCampbell, as it had a right to do, refused further to deal with the corporation or its liquidating stockholder.
Plaintiff repeatedly charges acts of “ perfidy ” deliberately planned by Seager in bad faith before and after April 7, 1943, and carried out thereafter by Seager and the other defendants in a so-called conspiracy against the corporation. For what happened before April 7th, plaintiff relies on inferences from the fact that during February and March, 1943, the volufhe of shipments by McCampbell to Sportseloth declined and at the time Seager insisted on withdrawing his profits from the company; and from the fact that there were no confirmations of “ firsts ” for shipment between March 4 and May 18, 1943.
There is no finding of any overt acts by Seager prior to April 7, 1943. The acts complained of took place after Seager had announced his withdrawal and there was no concealment as plaintiff knew immediately of McCampbell’s decision not to do business with plaintiff or the corporation. The decline in orders was not without precedent for something similar happened in the last two months of 1942. After the withdrawal in April it was natural there should be no confirmations until the yardage to complete the orders in the liquidation commenced on May 18th. As late as April 6th Seager was in conference with the corporation’s attorney discussing the possibility of a change to a partnership. As to the withdrawals of profits, the record shows that for every dollar Seager withdrew early in 1943, Washer withdrew the same amount at the same time and Seager used part of the withdrawals to pay off his stock in the corporation. These and other facts negate the unwarranted inferences sought to be made by plaintiff and the bad motives plaintiff imputes to all defendants.
The trial court properly dismissed the complaint against McCampbell and Grayhampton, though on the theory of a conspiracy to divert the fabric it is difficult to see why; since McCampbell held within its power its source of supply of the fabric which was supposed to be the subject matter of the alleged conspiracy. T+ ^ ~ee defendants could be in a co ¡Campbell if, as the court of conspiracy and 1------ „„„„^„ry duty is not sustained by the controlling facts against any of defendants. In selling to Seaglow and Textile and factoring the business through found, McCampbell But the court’s theory *306 Grayhampton, McCampbell was acting solely in its own best interests without any malice or any conspiracy against Sports-cloth and its acts were legal.
A court of equity looks to the merits and does not exalt form above substance. The corporation did not get under way successfully until late in 1942. The two parties to the .business separated early in 1943. Seager had furnished the business skill and ability; Washer was financier. What Washer is now attempting to do is to establish a right to share indefinitely, as an inactive partner, in Seager’s business ability, skill and enterprise. Plaintiff failed to sustain the burden of proof and neither Washer nor the corporation is entitled to an accounting or damages against any defendant.
On plaintiff’s appeal, the judgment in favor of McCampbell & Company, Incorporated, and Grayhampton Corp. should .be affirmed, with costs to said defendants-respondents. On defendants’ appeals, the judgment appealed from should be reversed, with costs to defendants-appellants and the complaint dismissed, with costs.
" Martin, P. J., Glennon, Callahan and Van Voobhis, JJ., concur.
'. On plaintiff’s appeal, judgment in favor of McCampbell & Company, Incorporated, and Grayhampton Corp. unanimously affirmed, with costs to said respondents. On defendants’ appeals, judgment unanimously reversed, with costs to defendants-appellants and the complaint dismissed, with costs. Settle order on notice.